We're going to call People v. Brandon Johnson. You're not Gilbert, are you? No, I'm not. My name is Erin. Okay. Are you going to argue? Pardon? Go ahead. There. It says Gilbert Sisson. Is he one of your associates? Yes, sir. Okay. Go ahead. This is good. I believe it. May it please the Court. My name is Erin Grebel. I represent the appellant, Brandon Johnson, in this matter. Mr. Johnson was found guilty of aggravated battery of a child stemming from an incident in January of 2007. We submit that the conviction should be overturned for three reasons. First, that the State Circuit Court failed to follow the appropriate procedure under Batson v. Kentucky to analyze Johnson's alleged error under that rule, and that if it had, it would have concluded that similarly situated white denial persons established that a Batson violation had occurred. Second, that the State's closing argument impermissibly shifted the burden to the defendant when it claimed that the cloak of innocence was removed prior to deliberation. And third, that the State failed to prove facts which support an inference of knowing conduct where an affirmative mechanism of injury was not presented to the jury. Taking the Batson issue first, Your Honors, if I may, appellant submits that the trial court effectively collapsed the Batson inquiry, which consists typically of three parts. First, that the defendant makes a primate basis showing, alleges some facts in which an inference can be drawn that discrimination on the basis of race may have occurred. After that, the prosecutor is expected or is inquired of to articulate then a race-neutral reason for the peremptory strike. And then at that point, the trial court conducts an inquiry as to whether or not the defendant has ultimately carried the burden as to whether the State's proper reason for the strike was in fact pretextual. Here, we submit that the prima facie case was satisfied. There were two jurors at issue as noted in the brief. The first is Juror Morgan, who apparently had a prior, albeit old, conviction that came to light after he was impaneled. The second is Juror Dabney, who had an adult daughter who was involved in child protection proceedings with the DCFS. With Juror Morgan, the recall of Juror Morgan to determine why he hadn't responded fully to the questionnaire during the voir dire process was brought about a bit later. At that point, defense counsel in fact raised an objection. There was an exchange between the defense counsel and also the prosecutor wherein the issues of both Morgan and Dabney were put before the trial court. Morgan was already selected. Is that correct? That's correct. And his challenge occurred the next day? At the top of my head, I couldn't tell you if it was actually the next day in real time. That seems about right. Apparently, the State had an opportunity to review some of the records. But what we submit, the prima facie case itself is satisfied except one is present because the fact that Morgan and Dabney were established in that exchange to be the only two black venire persons on the panel. We can look at the seven Rivera factors to know that the difference in races or ethnicities between the defendant, the jurors, the prosecutor, et cetera, the defendant and those two venire persons were the only persons of African-American descent present in the courtroom through jury selection. We also know that we can consider whether there was a disproportionate use of strikes against African-American venire members. In fact, the use of the peremptory strikes against the black venire persons was total. There were only two. By the end of the process, both had been struck, both peremptorily. So moving then to the second stage, what we submit is that the trial court should have really more formally asked the state to submit a race-neutral reason. The state does articulate a race-neutral reason with regard to Dabney, which is that of his older daughter having, well, what we can only drop in the record is that there's a civil proceeding with the DCFS, that she was accused of child abuse. Those were the venire persons' words. But what that reveals is that the trial court's inquiry, had it proceeded to the third stage, that it wouldn't have passed muster because we have venireman Yarbrough, who also had an adult daughter with some legal problems. She had been actually charged with criminal assault and was expected in court in his words the next day. Not against her daughter or child, though, right? Presumably not, Your Honor. And the difference between the two, of course, one would be a civil proceeding in the DCFS where there are allegations of child abuse. The severity, the actor, we don't know. But we do know that in the case of a white venire person, Mr. Yarbrough, that his daughter was accused of criminal assault, causing significant enough harm to another person to be charged. So the presence of that similarly situated juror resubmit wouldn't have overcome or, sorry, the defendants would have then carried their burden had the court done a three-step analysis. This was the same juror that had the reluctance to serve as a juror also, didn't he? He was uncomfortable sitting in judgment on someone else? He gave equivocal answers. Yes, Your Honor. There was an instance where he said he would feel very badly if he later found out the conviction was erroneous. That's rights neutral, correct. Except that it was never offered as reason, Your Honor. Perhaps if it had been offered, then the court would have rightly considered that in terms of whether or not the defendant carried its burden. But it was never offered. The only thing that was offered was the fact that he had this adult daughter with this child abuse issue going on. And then the prosecutor said something to the effect that striking one black juror does not, if that's the challenge, make, which the defendant submits further complicates any sort of rationale in terms of why the state might have been doing it in a race-neutral fashion to appellant. It sort of defeats that. And then defense would ultimately carry its burden. It appears that it was well in everyone's mind as to that there was two black B'nai Armin members that were struck, and the prosecutor, in trying to the best of her ability to offer reasons, though not afforded that opportunity by the trial court, just as the defense counsel wasn't, in effect minimized the effect of that peremptory strike. Also, Your Honors, if we turn away from B'nai Armin Dabney and we look at B'nai Armin Morgan, the gentleman who had the old conviction that later came to light, the issue there was expressed primarily by defense counsel. The prosecutor's rejoinder was more on to B'nai Armin Dabney. In that situation, of the jurors that were ultimately impaneled, we have Morgan similarly situated to Atten, Brown, Cortez, Somers, Schaefer, Mazzanelli, and Bateman. The majority of those impaneled actually didn't give a direct response to that question as to whether they had had prior charges or convictions. Some of them answered one or the other. Atten and Mazzanelli didn't answer at all. And what the record reflects is that neither of those two otherwise similarly situated white jurors were asked to come back and revise their answer, as was B'nai Armin Morgan. Additional guardiere was elicited from him, responses as to why he didn't report. And so just the fact that there are those similarly situated white jurors, we submit that's a prima facie case and that's satisfied. Were their answers, the other jurors' answers, false also or just incomplete? They were incomplete, and that's all I know from the record, Your Honor. And what about Juror Morgan's answer? Was it false and it was not incomplete? It was not unequivocal, right? Or was unequivocal? Is the point you're making that the two that they didn't challenge that were white may have also had records and we don't know that and then the state chose to overlook that? I mean, that's a possibility. I certainly am not saying that the state purposely overlooked anything, only that there was this additional guardiere with regard to Morgan and not with regard to these other jurors who, as you said, didn't give a complete answer. But didn't you surmise that if it was overnight that somebody went and looked at the rap sheets on all these people to see if there was any outstanding convictions? Yes, Your Honor, because the statement on the record by the state's attorney was that he had this theft over and outstanding burglary. But we don't know, though, if there was an inquiry conducted into those other similarly situated white jurors that the record is silent on that fact. We can't presume that there was nothing there? We can't presume either way, I guess. I guess we can't presume either way. I guess there's a possibility that they could have had the same conviction and that wasn't raised because it was racially motivated. I mean, that's speculation, but is that what you're saying, that just by singling that black juror out, Vanierman out, that that raised the possibility and established your presumption? Yes. The only juror that they, during, after the juror was, after Morgan was selected and then over the night they did a record check, he's the only person that they did a record check on, the black juror. They didn't do a record check on anybody else. We don't know that. I have no way to know that, Your Honor. But what I would suggest is that under the formal Batson inquiry, that there was certainly, once the defense had raised what amounts to a prima facie case, that, hey, we have one juror who was preemptorily struck. He's one of only two black jurors on Vanier. And there are other jurors who did not give a complete answer at that point. The state could have elicited additional voir dire to find out from those people to ask them to revise their answers. The state could have simply said to the trial court, I conducted the inquiry. This is the only juror where there's an issue, and so he's not similarly situated. And the inquiry would have likely failed at that point if that were the case. However, the record is silent as to those facts. What we're left with then is the fact that the one black juror was submitted for additional voir dire. We don't know whether the other persons who also left out the question in their verbal response, why they did or if it was, in fact, incomplete. And what we do have in addition to that is the prosecutor's admission of sorts, or a concession perhaps, that when questioned verbally by the trial court, the state's attorney said, well, yes, it's a question that he did answer for you easily enough today. Yeah, I have had a charge. And so I think the first inference from that statement, no one elicited any information from Mr. Morgan as to whether or not he understood the questionnaire, how well he reads, any sort of foundational questions that would explain why his answer wasn't complete. Because when questioned verbally, it seems that everyone was satisfied that his response was complete to the best of his ability. Could the trial judge have properly considered that the day before the state had accepted this juror in determining this Batson challenge? Isn't that an indication that they weren't being selective of excluding African-Americans, the fact they accepted this man? I think, yes, Your Honor. It would be one of seven factors. But I think that that one fact won't hold the day for the prosecution in light of the rest. The third stage of Batson is something that's not optional, as we know from the case law. The trial court inquiry doesn't end after the state offers a race-neutral reason, which seems to be about as far as we got in this case. The third step was very much abbreviated here. At that point, the trial court can make findings, whether it is to demeanor or credibility, or whether it feels that the state has or has not offered contextual reasons. What we have instead is the trial court stating to the parties to basically hold on a moment while he retires to double-check on something. And then the response, the only finding, if you will, is that the fact that the Nairman-Morgan omitted a complete response is, quote, a significant issue. We certainly don't dispute the significance of that generally. But in terms of the Batson inquiry, it's certainly insufficient, and it doesn't amount to a finding that the state's proper reasons were not contextual. I would like to add, Your Honors, that there are potentially two remedies for the Batson violation. One would be a remand for the full Batson hearing where the record is incomplete. We submit that though not a model of clarity, there is enough information on the record for the second outcome, which is actually a reversal and a remand for new trial. If I may turn to our second submission. The state's closing argument, appellant submits, prematurely shifted the burden to the defendant by removing the cloak of innocence prior to deliberation. During closing argument, the state's attorney told the jury that defendant Johnson is presumed innocent and has been through this whole trial, quote, until now, because that is overcome. He has been proven guilty. At that point, the defense counsel lodged an objection. The court's response in overruling that objection was that the prosecutor, quote, can argue inferences from the facts. Again, then, the state reiterated that the burden was overcome and he's been proven guilty. The contention here is that certainly there is an error of law, that the prosecutor misstated when the burden lifts. It's, in fact, during the course of deliberation. It's not prior to, and that that was found to be an error of law in both Weinstein and Brooks. The standard, however, is not just that there's an error, but that there's manifest prejudice. If we compare the case in Brooks in the first district in 2004, we know that a similar exchange happened where the state's attorney said, when you go back in the jury room, the presumption of innocence is gone. That seems to set the timeline a few minutes into the future compared to the case here. In that case, the prosecutor said, as you go into deliberation, then the cloak of innocence is gone. Here we have the prosecutor essentially removing the cloak of innocence during closing argument. So it's prior in time. And the Brooks court said that that was an error, even that later in time removal of the cloak of innocence was an error of law. However, there was not manifest prejudice in that case because of the timing, because it was the state's opening closing argument and not the final closing argument, because there was rebuttal, because there were trial instructions from the trial court. That's where our situation diverges significantly. What we have here is the defense's objection. Not only is it overruled, but then an explanation before the jury, the court states that the prosecutor may argue inferences from the facts. And so what we are submitting then is that... Following the objection, was that repeated again, that he was not presumed? I thought you said they argued, well, he's been proven guilty beyond a reasonable doubt after the objection. Your Honor, the state's attorney made the statement, he's presumed innocent until now because that's overcome, he's proven guilty. Then there was the objection and then the ruling. And then the state's attorney said, in reiteration, it's overcome, he's been proven guilty. It's okay, it's overcome. It's overcome with the reference. Okay. Yes. So our submission then is that the overruling the objection, but in fact the manner in which it was done, conveyed a judicial imprimatur to the state's argument, in fact, and as much equated her misstatement of the law, inadvertent though it could have been, we don't know, although it was reiterated after the trial court endorsed it. And had it been another objection in a different scenario, maybe it wouldn't have gone that way. But certainly here in front of the jury, it did appear to be an endorsement of sorts. And so when the prosecutor reiterated that the burden had, or sorry, that the cloak of innocence was gone, we submit that she removed it prematurely and that is an error and also constitutes manifest prejudice in this case. And we would also distinguish between the case in Weinstein, which is cited in the brief. There's a difference there in Weinstein where it was considered to be repetitive the number of times that the state's attorney had referred to shifting the burden or removing the cloak. And again, we offer the same distinguishment that while the repetition perhaps took place during a small amount of time, it was significant enough given the trial court's response to the objection to convey that judicial imprimatur. Third, Your Honors, we submit that the evidence presented by the state is insufficient to support an inference that the defendant appellant acted knowingly where an affirmative mechanism of injury was not before the jury. What we have, Your Honors, is two avenues by which the jury could have inferred knowing conduct. The first would have been from the surrounding circumstances, any contemporaneous statements of the defendant and things like that. The second avenue would be by the severity of the injuries themselves. The first one is not so much at issue because they were not at trial. We don't have a lot of facts. We don't have testimony by the defendant, Mr. Johnson. What we do have and what the state seemed to have presented in their theory of the case at trial was the severity of the injuries. And so when we look to Illinois case law, we have three cases, Rader, Renteria, and Coleman. All three could be termed shaken baby syndrome cases where the sufficiency of the evidence is examined. Our submission is this, that the facts of this case are distinguishable from the holdings in Renteria and Rader and then Coleman which came behind and affirmed them because in those three cases it was noted that in addition to the medical label of shaken baby syndrome, there was medical testimony that characterized the mechanism of injury as one of several things, repeated, violent or severe. You'll have time for rebuttal, counsel. Thank you. Thank you. May it please the court. Counsel. My name is Sharon Shanahan and I represent the people of the state of Illinois. I think there is very little question that there is no Batson issue here. And if there was, there certainly is an overabundance of race-neutral reasons. I would note, as I did in our brief, the trial court didn't even think there was a Batson objection here because it was sort of an aside, just kind of an offhanded comment when they were discussing the state's decision to strike Jura Morgan the day after they had accepted. And so in any case, the trial court certainly believed that there wasn't a crime of patient case. Second of all, if ever there was a good reason to strike a juror, the state had one with Mr. Dabney. Mr. Dabney's daughter was accused of child abuse of Mr. Dabney's granddaughter. And I don't think it matters in the least whether these were fitness charges brought by DCFS or criminal charges. The fact is that Mr. Dabney's daughter was charged with abusing a child, just as the defendant was charged with abusing a child. And I think there is a special chord that is struck in all of us about the abuse of children. And I can't help but wonder, and I'm sure the prosecutor did too, if Mr. Dabney couldn't see his daughter similarly situated to the defendant and feel sorry for him for inappropriate reasons by comparing him to his own daughter, his own situation. I'm sure Mr. Dabney didn't want his own daughter to be subjected to criminal charges and would feel bad about it. So I think the very fact that, and that's what's, as I'll get into a little bit later, that's what's very distinctive about the juror Yarborough is that it's not abuse to abuse. It's one person charged with battery, but the other person's charge was harming a child. And that's the exact issue that was in here. Furthermore, as you noted, he had a lot of reasons for not wanting to be on the jury. He said he had a problem with sitting in judgment of any human being. He did not like the idea of judging anybody. He felt that the worst thing he could do is hurt someone, and they are not guilty. And he said if he later found out that the jury's decision wasn't right, he couldn't live with it. Were those reasons that the state gave, or does that just show up somewhere in the record? It's in the record. Well, that's not a reason the state gave, or is it? The whole problem is that the defendant never truly made a Batson objection that was cognizable. But you're suggesting we send it back for a hearing, then? No, I'm not at all suggesting that. I'm suggesting that when the record is as clear as this case is, that there are race-neutral reasons for striking these two jurors. Ms. Shanahan, I'm more concerned about Mr. Morgan, and at the point that it looked like it could be protectful when he comes back the next day and the state comes back and says that they have these charges that he failed to raise. Shouldn't the court have then given the defendant the opportunity to further investigate the other two white jurors that may or may not have had charges to rebut? There's absolutely nothing to indicate that the defense counsel couldn't have done that. I mean, he didn't ask to. Did not ask to. No, he did not ask to. And I have to point out the serendipity of this claim. The state accepted this black juror. Morgan. No problem. Accepted him. It was pure serendipity that they go back that night and run rap sheets, as you say, on all of the jurors that are chosen. That's what the record shows? Yes. Well, it's no. I think we both agree, counsel for the defendant and I both agree, that that's what happened. It was they picked those jurors, they came back the next day, and it is clear that the state's attorney has done something to check on the criminal background of the jurors. Of all jurors or just this juror or does the record reflect either way? It does not reflect either way. But as I say, it's a huge presumption and one not raised by the defendant at trial that the state's attorney said, oh, goody, that black guy that I picked yesterday, I changed my mind about him and now I have a reason to get rid of him. If the state had objected to Mr. Dabney initially, there would be far more credence to this claim. Ms. Morgan. Aren't we on Ms. Morgan? I'm sorry. That's okay. If the state had initially objected to Mr. Morgan, there would be, I think, a lot greater claim. Or if the defense had asked to inquire about the other jurors. Absolutely, any of those things. And certainly defense counsel could have raised those questions. Did you ask about the others? He did not. Is this the only one? Can I check? None of those things were raised before. And the likelihood of this being an, as I said, how do you plan, how do you accept a juror with the plan that you're going to strike him the next day? And that has to be the prosecutor's intent because he did, she did accept him on the juror. So I think the whole thing about that. Well, there's a lot of regret in jury selection. Oh, absolutely. I would like to. Better choice. I think one of the things that we need to consider is what makes a race neutral reason. This court has noted that the state's burden is not heavy, that the state's explanations need not rise to the level of justifying a challenge for cause, that unless there is discriminatory intent inherent in the prosecutor's explanation, then the reason offered will be deemed race neutral. So, therefore, if we had a prosecutor say, I ran a check on this juror, then you might have an inherent intent, but that's not here. I think this is also important. The explanation given by the prosecutor need not be plausible, much less persuasive. The last bats of issue I had, the juror was overweight, and the prosecutor excused her because he didn't think that she could comfortably sit in little wooden chairs like this. Is that plausible or not? I don't know, but it passes Batson. The legitimate reason, and again, these are all quotes from Batson cases in this state, and some of them from this district. The legitimate reason is not a reason that makes sense, but rather is a reason that does not deny equal protection. A race-neutral explanation is one that is based on any reason other than race. And a peremptory challenge for any reason or no reason is legitimate unless it is exercised in a racially discriminatory fashion. And I think we have to consider the discretion that we have to give to the trial court who was there to observe this. And in my brief, I discuss the deference that should be given to the trial court. Who could observe these? Who could observe the prosecutors? And that's really the most important thing here is what was the prosecutor's intent. And Cason notes that when there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous because the trial judge is in the best position to make this determination because they're familiar with local conditions and prosecutors and can draw upon their powers of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one. So we have Juror Dabney, whose daughter is accused of abusing his grandchild, similar to the defendant in this case, who has made very equivocal statements about whether he could fairly serve. We have Mr. Morgan, who not only lied the first day when he was accepted, but continued to lie when he was brought back in before the judge the next day. And we cannot overlook the fact that he was accepted by the prosecution, and the prosecution certainly had no way of knowing that when the jurors were checked that night to see if any of them had criminal backgrounds that this juror would show up with a criminal background. And like I said, after they know this and he's brought back into chambers, the trial court repeats the language of the questionnaire and says, do you have any prior criminal charges or convictions? And again he says no. And then he says, the trial court says, have you ever been charged? And finally he says, well, I haven't actually. And his opinion of it is different. But he lied repeatedly, and I think that is important too. And the prosecutor was unequivocal. She stated that if Morgan had disclosed the prior criminal charges, she would have used a peremptory challenge to excuse him. And she also unequivocally stated that she would not have kept anyone on the panel that had been charged with burglary. I would note that the trial court did not feel that in the third stage here, if we get to that, the trial court did not feel the defendant had carried his burden of proving purposeful discrimination. The trial court noted that Juror Morgan did not answer the question of whether he had prior criminal charges and that the issue of prior criminal charges was significant. And neither the defense counsel nor the trial court ever mentioned the incontestably reasonable reason for excusing Juror Dabney. And the trial court found, and this is a quote from the trial court, no basis whatsoever to believe that either juror was excluded because of his race. And I think that that decision should be affirmed. I think we've discussed the difference if you get to the comparative juror analysis. I think we've discussed the extraordinary differences between Jurors Dabney and Yarbrough. Second of all, basically it's Juror Morgan versus a half a dozen jurors that just left this blank. And essentially, if a person had no criminal charges or convictions and left this blank, then they would be answering truthfully. But if they did have prior criminal charges or convictions, then they could not leave this blank and say nothing and be truthful. And that's the distinction here. The only person that, the only potential juror that Morgan would be similarly situated with, would be someone who had a prior criminal charge who failed to respond affirmatively on the questionnaire. And the defendant gives no indication, either at trial or here, that any of the other jurors who said nothing about prior criminal charges actually had prior charges like Morgan did. And again, this is something that could have been, if defense counsel truly believed there was a Batson issue here, these are the things that could have been brought up at that point in time. Moving on to, I want to make sure that I address the knowing concept of the case, and so I'm going to move to Issue 3 briefly. The defendant basically is saying this wasn't knowing it was accidental. That's what it comes right down to. And knowledge can be reasonably inferred and is often proved by circumstances surrounding the incident, including the nature and degree of the severity of the victim's injuries. And in Renteria, which is cited on our brief, we find the case of the court rejecting a defendant's claim that the injuries to the child were caused by attempts to revive the child, and the court found that the medical expert's conclusion of shaken baby syndrome supports the conclusion that the defendant acted knowingly. The experts in this case established that the constellation of injuries inflected on the baby could not have been received in the manner described by the defendant. Now, when I say the manner described by the defendant, the defendant did not testify in this case, but two things happened here. Number one, the defendant did make a statement to police describing his version of things, of how he picked up the baby and tripped and the baby fell. And that was submitted, so that fact is in the record. Then the defense attorney comes up with a hypothetical, and he takes the defendant's version of what happened, the statement that he made to police, he takes that, he adds a really important additional fact, which the defendant never alleged at all, which is the defendant said he tripped, the defendant said the baby fell and hit the coffee table. Then the defense counsel says, and then the defendant fell on top of the baby. Now, the defendant never said that, so this is an entirely unsupported portion of the hypothetical. But even when that exact hypothetical was presented to both experts, they said you couldn't get this constellation of injuries from that action. And they went on to say that the only way that these injuries could have occurred is by shaking the baby. And I think it's important to note that there is evidence in the record that this is, that some of the baby's injuries were not new. There were chronic bilateral subdural hematomas, which means that they were old. And although theoretically that could have been caused at birth, Dr. Spivey had checked the baby's birth records and there was no trauma at birth. There was a complex skull fracture on the right side of his head. There were acute new subdural hematomas on both sides. That goes to the brain going back and forth, the whole part of shaken baby syndrome. And Dr. Spivey said that since the hematomas were on both sides of his brain, the injury was caused by acceleration-deceleration. That is, the brain moving back and forth, hitting the skull. That's shaken baby. The fracture of the left forearm could not have resulted from the fall that the defendant described. The global hypoxic ischemic injury, which is a widespread injury to the brain matter itself, is also caused by acceleration-deceleration. There were multiple retinal hemorrhages in his eyes that are also caused by acceleration-deceleration. And as I said, Dr. Spivey says one fall with one impact against a coffee table could not have caused all this injury in all these different areas of the baby. And she testified that the injuries were caused by shaking. Dr. Leonard concurred. He was actually the one that treated the baby, operated on him. And I'm quoting him when he says, in the constellation of Tristan's injuries, I have never seen a simple fall produce this level of injury. He gave no more than a 5% chance that an incident like the hypothetical would cause subdural hematomas like the baby had. And Dr. Leonard also goes back and notes these old injuries, these chronic subdural hematomas that also made him more suspicious that the injuries were not accidental. We have both Dr. Spivey and Dr. Leonard testifying that the babies in constellation of injuries, the subdural hematomas, the broken arm, the retinal hemorrhages, the chronic subdural hematomas, the skull fracture, that that constellation of injuries could not have been accidental. And so there's really little doubt at all here that these were very, very specific injuries. Coleman cited by the defendant, as I noted in my brief, I found it a little odd that they cited it because they actually found that substantial head and brain injuries with bruising on both sides of the face, retinal hemorrhaging, subdural hemorrhaging, bleeding with the brain, and subdural hematomas and substantial brain swelling that the prior attack could properly infer from those injuries that the defendant knew that his actions created a strong probability of death or brain loss. Thank you, counsel. Any rebuttal? Thank you. First, Your Honors, back to the Batson issue. The Coleman case that was cited in our brief notes that the trial court is, in fact, possesses a duty to undertake the Batson inquiry when it is raised. It was certainly raised. The prosecutor, in fact, argued the merits of it, which is why the challenge is certainly not subject to waiver. She mentioned the word Batson several times. I'm sure it did not escape the trial court what sort of challenge was being raised, and there was a duty to conduct the inquiry. In fact, we never received then on the record a race-neutral reason for Dabney because the inquiry was incomplete. Had the prosecutor perhaps had the benefit of formal inquiry and had been presented with the presence of similarly situated white jurors in the case of Morgan and Dabney, perhaps there would have been something different, but there's just not. And the record as it is, what we're left with among those seven Rivera factors is who is white, who is black, who is struck, and who is similarly situated. Your Honors, our third submission with regard to sufficient evidence of knowing conduct, it does not matter what the defense counsel's theory was at trial. The issue here is whether or not the state offered proof that there was knowing conduct. The precedent in Rader, Renteria, and Coleman informs us that in each of those cases, in addition to the tag, shaken baby syndrome, there was medical testimony that there had been severe, vigorous, repeated shaking as it varied from case to case. Here what we have are not once but twice the medical expert testified that the mechanism was unknown, that in the absence of a mechanism, she drew her conclusion. We submit that the absence of a plausible mechanism is in defense's burden to supply one. But what the state must do is induce enough testimony so that there is in fact a characterization, something to support that label so that the jury can know what it is that that denotes. And it is that way that the knowing element can be inferred. Thank you. Thank you, ladies, for your briefs and argument.